# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALLEN POYTHRESS, JR.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No.: 2:21-cv-1608-AMM** |
| **CITY OF ADAMSVILLE and CHRIS SHAW,** | ) | |
| | ) | |
| **Defendants.** | ) | |

| | | |
|---|---|---|
| **TONY WASHINGTON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No.: 2:21-cv-1658-AMM** |
| **CITY OF ADAMSVILLE and CHRIS SHAW,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

These consolidated cases come before the court on Defendants City of Adamsville ("the City") and Lieutenant Chris Shaw's motion for summary judgment.[1] Doc. 31. For the reasons stated below, the motion is **GRANTED**.

---

[1] Citations to the docket in *Washington v. City of Adamsville*, No. 21-cv-1658, are identified as "*Washington* Doc. __." All other CM/ECF citations are to the lead case, *Poythress v. City of Adamsville*, No. 21-cv-1608.

## I.   BACKGROUND

Facts set forth in the parties' statement of undisputed facts are deemed admitted for summary judgment purposes unless controverted by the response or reply of the opposing party.[2] Doc. 21 at 19–20. Where disputed, the facts are construed in the light most favorable to the non-movants, Plaintiffs Allen Poythress, Jr., and Tony Washington.

Mr. Poythress started working as a patrol officer for the City of Adamsville in the summer of 2019. Doc. 34-1 at 3, Depo. 12:16–21; *see also id.* at 4, Depo. 13:3–6. Mr. Washington started working as a patrol officer for the City of Adamsville in 2019. Doc. 34-9 at 8, Depo. 32:12–20. Mr. Washington was promoted to the position of a Sergeant in late 2020 or early 2021. *Id.* at 9, Depo. 33:5–11. Mr. Washington was Mr. Poythress's immediate supervisor. Doc. 34-1 at 13, Depo. 50:8–9. Lieutenant Elvis Lenninger was next in the chain of command. *Id.*, Depo. 50:9–10.

The record leaves unclear what position Lieutenant Shaw held in the chain of command in relation to Mr. Washington and Mr. Poythress. Neither plaintiff deposed Lieutenant Shaw or any representative of the City. *See* Doc. 34 at 2

---

[2] The court's initial order provides that "[a]ll statements of fact, in all sections of the brief, must be supported by specific reference to the CM/ECF document and page number of the evidentiary submission." Doc. 21 at 18. The court warned the parties: "Compliance with this requirement will necessitate filing the evidentiary submission in support of the brief separately from the brief and may necessitate filing the evidentiary submission one or more days prior to filing the brief." *Id.* (cleaned up). The parties did not file compliant briefs. The defendants did not cite to the CM/ECF document and page number of the evidentiary submission. The plaintiffs disputed facts without citations to the record.

(displaying the table of contents for all evidence in the record). The only depositions in the record are those of Mr. Poythress and Mr. Washington. *Id.*

### A. Lieutenant Shaw's Sexually Disparaging Comments in May 2020

In May 2020, Lieutenant "Shaw made sexually disparaging comments towards [Mr. Poythress] where he stated [that] [Mr. Poythress] walk[s] like a faggot." Doc. 34-1 at 35, Depo. 140:20–23. Lieutenant Shaw stated that "[o]nly gays walk that way and since [Mr. Poythress] walk[s] like this [he] must be one." *Id.* at 35–36, Depo. 140:23–141:1. Mr. Poythress made an oral report of Lieutenant Shaw's comments to Chief Officer Warren Cotton "[s]hortly thereafter." *Id.* at 36, Depo. 141:1–3.  But "no corrective action was taken" at the time. *Id.*, Depo. 141:3–4. Mr. Poythress testified that the "only time that [Lieutenant Shaw] made any sexual comments towards [him]" was when he told him in May 2020 that he "walk[ed] like a faggot." *Id.* at 41, Depo. 163:6–16. Mr. Poythress also conceded at the summary judgment hearing that the comments that Lieutenant Shaw made in May 2020 about his manner of walking were the only set of sexually derogatory comments in the record.

### B.  The Jail Incident

On September 22, 2020, Mr. Poythress was on patrol duty in the evening when he received a call from Lisa Clifton, a white female dispatcher at the Adamsville City Jail, about an inmate named Jason Isbell. Doc. 34-1 at 13, Depo. 51:6–11. Ms.

Clifton told him "that Mr. Isbell was causing a problem in the jail, masturbating and refusing to comply with her commands." *Id*., Depo. 51:14–16. Mr. Poythress arrived and supervised while Mr. Isbell took a shower. *Id*., Depo. 52:19–21.

Mr. Poythress then left the station, but Ms. Clifton called him back in for assistance with Mr. Isbell. *Id*. at 18, Depo. 70:13–18. Ms. Clifton also called Mr. Washington. Doc. 34-9 at 9, Depo. 35:18–36:3. Ms. Clifton told Mr. Washington that Mr. Isbell "wouldn't comply with them and he was just being disruptive and wouldn't do anything that they were asking him to do." *Id*., Depo. 36:6–8.

A soundless surveillance camera recorded the following events inside Mr. Isbell's cell in the early hours of September 23, 2020. Doc. 40-A.[3] Mr. Isbell was lying on a mat. *Id*. at 2:59. Mr. Poythress rolled him over and kept Mr. Isbell down with one of his knees placed on his back. Mr. Washington bent down, as if to speak to Mr. Isbell. Mr. Isbell rose to his feet, with one arm held by Mr. Poythress and the other by Mr. Washington. Mr. Poythress and Mr. Washington led Mr. Isbell out of the cell.

---

[3] The defendants' notice of conventional filing, Doc. 40, refers to two separate surveillance video footages: Video 5845 and Video 1844. Video 1844 picks up where Video 5845 stops. For convenience, the court cites Video 5845 as Doc. 40-A and Video 1844 as Doc. 40-B. Citations to the video footages are to the minute of the timestamp on screen as the video plays. The court has omitted "*id.*" citations for sentences describing videotaped events that occurred within the same minute as the preceding events. Mr. Poythress is the individual wearing a vest with the word "POLICE" on his back.

Mr. Washington wheeled Mr. Isbell inside the cell in a restraint chair, with his wrists already strapped to the arms of the chair. *Id*. at 3:00. Mr. Washington strapped Mr. Isbell's ankles to the chair by placing each foot inside a loop that appears to be made of fabric. *Id*. at 3:02. Mr. Isbell did not move while Mr. Washington did so. Ms. Clifton came inside the cell and helped Mr. Poythress strap Mr. Isbell's shoulders to the chair. *Id*. at 3:03. Mr. Poythress, Mr. Washington, and Ms. Clifton left Mr. Isbell's cell. Mr. Isbell sat in his restraint chair in the middle of his cell.

Alone in the cell, Mr. Isbell slipped both feet out of the loop. *Id*. at 3:11. Using his free legs, Mr. Isbell pushed the restraint chair towards the back of the cell. *Id*. at 3:12. Mr. Isbell pushed the chair all the way back against the wall. *Id*. at 3:18.

Mr. Poythress re-entered Mr. Isbell's cell. Doc. 40-B at 3:18. Mr. Poythress pulled Mr. Isbell's chair forward to the middle of the cell. Mr. Poythress bent down to place Mr. Isbell's feet back into the loops. *Id*. at 3:19. After Mr. Poythress placed Mr. Isbell's right foot in the loop, he moved to the other side to place the left foot in the loop. Mr. Isbell slipped his right foot out of the loop, which was not tightened around his ankle. Mr. Isbell crossed his right ankle behind his left ankle, neither of which were strapped to the chair. Mr. Isbell shifted his knees but did not lift his legs, keeping his ankles crossed. Mr. Poythress pulled out his taser, placed the tip on Mr. Isbell's left thigh, and pressed it down. Mr. Isbell's body squirmed. Mr. Poythress

lifted the taser and placed the tip on Mr. Isbell's chest. *Id*. at 3:20. While the taser was on his chest, Mr. Isbell shuffled first his left leg and then his right leg.

Mr. Washington came to the entrance of the cell and stood in a spot where the back of his body partially blocked the view of the camera. Mr. Poythress put his taser back into the holster and stood up. Mr. Isbell was speaking the whole time, which cannot be heard on video. Standing next to Mr. Isbell, Mr. Poythress pulled out his taser again. Mr. Poythress bent down and pointed the taser somewhere in the middle of Mr. Isbell's body, the exact location of which cannot be seen because of Mr. Washington obstructing the view of the taser. Mr. Isbell moved his torso forward slightly.

Mr. Poythress walked over and stood by the door with Mr. Washington. *Id*. at 3:21. Mr. Isbell continued speaking to Mr. Poythress and Mr. Washington. Mr. Washington left. Mr. Isbell tried to move his legs but could not do so, because his ankles were tightly strapped to the chair. Mr. Poythress stood in front of Mr. Isbell and spoke to him. *Id*. at 3:22. Mr. Poythress exited the cell and closed the door. *Id*. at 3:23.

Mr. Poythress spoke to Mr. Isbell from outside of the cell. *Id*. at 3:24. Mr. Poythress re-entered the cell and pulled Mr. Isbell's restraint chair back, so that it was up against the back wall. *Id*. at 3:25. Mr. Poythress exited the cell. *Id*. at 3:26.

6

On September 23, 2020, Mr. Poythress filled out three Use of Force Information and Statement Reports regarding the jail incident with Mr. Isbell. Doc. 34-6. Mr. Poythress filled out a Report for using an "armlock" on Mr. Isbell, *id.* at 1, and two Reports for using his taser on Mr. Isbell, *id.* at 2–5. Mr. Washington testified that "Mr. Poythress used his taser on Mr. Isbell . . . approximately two times." Doc. 34-9 at 13, Depo. 51:15–18.

The first taser Report states that Mr. Poythress "pulled out [his] taser after [Mr. Isbell] refused to place both of his legs in the chair . . . [and] took his right leg out[,] attempting to kick [Mr. Poythress]." Doc. 34-6 at 2; *see also* Doc. 34-1 at 16, Depo. 62:3–5 (Mr. Poythress's deposition testimony that the "reason [he] dry stunned [Mr. Isbell] with a taser" was because "when [he] tried to put one leg in, [Mr. Isbell] attempted to kick [him]"). The Report further states that Mr. Poythress activated "the taser on [Mr. Isbell's] left thigh for approximately 2 seconds and [Mr. Isbell] compl[i]ed before [his] battery died." Doc. 34-6 at 3. Mr. Poythress testified that he tased Mr. Isbell on the thigh at timestamp 3:19:48 in the surveillance video. Doc. 34-1 at 22, Depo. 85:11–15.

The second taser Report states that Mr. Poythress "placed the taser on [Mr. Isbell's] thigh," but that "[a]t that time [his] taser wouldn't work properly." Doc. 34-6 at 4–5. Mr. Poythress testified at his deposition that he filled out the form "[b]ecause [he] unholstered the taser," not because he tased Mr. Isbell. Doc. 34-1 at

17, Depo. 67:2–5. Mr. Poythress denied that he activated the taser on any other occasion when he placed the taser on or near Mr. Isbell's body and testified that Mr. Isbell's movements caught on video were "voluntary reaction[s]" that were not in response to being tased. *See id*. at 22–24, Depo. 85:19–96:10.

At other times, Mr. Poythress represented that he tased Mr. Isbell more than once. The EEOC Charge of Discrimination that Mr. Poythress filed on March 8, 2021, states that he "stunned" Mr. Isbell three times. *See* Doc. 1-3 ¶¶ 17, 21, 30. At one point in his deposition, Mr. Poythress testified that he "tased Mr. Isbell twice." Doc. 34-1 at 27, Depo. 105:13–15. Nevertheless, construing the evidence in the light most favorable to Mr. Poythress, the court takes Mr. Poythress's testimony to be that he did not activate his taser more than once on Mr. Isbell.

During the jail incident, Mr. Washington did not "ever tell Mr. Poythress to put his taser away." Doc. 34-9 at 13, Depo. 49:14–16. Although he had "the authority to tell [Mr. Poythress] to put away his taser," he did not do so because Mr. Isbell "ha[d] clearly kicked his legs out of the restraints and [he was] being noncompliant." *Id*., Depo. 49:21–50:3; *see also id*., Depo. 50:16–20 ("[R]estraints are not handcuffs and you see he has already kicked his legs free from the restraints, and by you kicking your legs and doing stuff like that, you are not just going to stand there and let somebody kick you."). According to Mr. Washington, Mr. Isbell didn't "have to be a threat to be noncompliant." *Id*. at 17, Depo. 65:12–13. "Mov[ing] the chair and

8

[taking] his legs out of the restraint" was "a form of noncompliance towards the orders given to him in the jail." *Id.* at 12, Depo. 48:18–20. Mr. Washington testified that the things that Mr. Isbell said made him "aggressive": "He may not be physically, but he's verbally." *Id.*, Depo. 46:15–16.

### C. Investigation of the Jail Incident

On September 25, 2020, Mr. Poythress and Mr. Washington were notified that they were the "subject . . . in an administrative investigation" regarding the incident with Mr. Isbell. Doc. 34-10 at 1 (cleaned up); Doc. 34-11 at 1 (cleaned up). Mr. Poythress's Employee Notification Form stated: "Chief Warren Cotton[,] the complainant, alleges that while on duty you dry stunned a restrained jail inmate with your city issued taser numerous times, in direct violation of the police department[']s Policy and Procedures." Doc. 34-11 at 1 (cleaned up). Mr. Washington's Employee Notification Form stated: "Chief Warren Cotton[,] the complainant, alleges that you were the supervisor on duty and you were present when Officer Allen Poythress dry stunned a restrained jail inmate with his city issued taser numerous times, in direct violation of the police department[']s Policy and Procedures." Doc. 34-10 at 1 (cleaned up). The Investigating Officer who signed these forms was Lieutenant Shaw. *See* Doc. 34-10 at 1; Doc. 34-11 at 1.

Pending the investigation, Mr. Poythress and Mr. Washington were placed on administrative leave with pay. Doc. 34-1 at 26, Depo. 102:3–8 (Mr. Poythress's

testimony that he was placed on administrative leave with pay on September 25, 2020); *Washington* Doc. 21 ¶ 21 (Mr. Washington's complaint alleging that he and Mr. Poythress were placed on "administrative leave with pay").

On September 27, 2020, Mr. Poythress filed a formal grievance about the "sexually disparaging comments" that Lieutenant Shaw made in May 2020. Doc. 34-1 at 35–36, Depo. 140:20–141:5.

### D. Mr. Poythress and Mr. Washington's Termination

On October 16, 2020, Mr. Poythress and Mr. Washington signed Disciplinary Action Forms that stated that they were terminated as of that day. Doc. 34-7; Doc. 34-14. The other signatures on the Forms were that of Chief Cotton and the Human Resources (HR) Director. *See* Doc. 34-7.

The Disciplinary Action Forms stated that the incident at issue occurred on September 22, 2020, to September 23, 2020. *Id.* The Forms listed multiple grounds for termination, including deliberate falsification, negligent use of City property, and violations of City policies. *See id.* Regarding Mr. Poythress's use of taser on Mr. Isbell, the Disciplinary Action Form stated:

> [Mr. Poythress] violated the Police department policy on Use of Force (6-00.5); the unjustified repeated use of a Taser on a restrained inmate. [Mr. Poythress] violated the Police department policy on Electronic Control Devices (7-00.20) when he deployed a Taser on a passively resistant inmate who was restrained. [Mr. Poythress] violated the Police department policy on Electronic Control Devices (7-00.20) when he used the device as [a] punitive measure. [Mr. Poythress] violated the Police department policy on Electronic Control Devices (7-00.20)

when he used the device on a handcuffed person who was not actively resistant.

*Id.* at 1–2.

Regarding Mr. Washington's role in the jail incident, the Disciplinary Action Form stated that "[m]embers designated as supervisors by virtue of their rank or classification shall, in conformance with Department policy and regulations, be responsible for the work and conduct of subordinate personnel." Doc. 34-14 at 2. The Form further stated that Mr. Washington was "responsible for the conduct of his subordinate as follows" and listed Mr. Poythress's violations of department policies as described above. *Id.*

The parties dispute whether Ms. Clifton, the white female dispatcher, was terminated and then re-hired by the City of Adamsville. *See* Doc. 32 at 15; Doc. 37 at 5.

On February 2, 2022, the Alabama Peace Officers' Standards and Training ("APOST") Commission, an Alabama state agency, held a character review hearing "to consider the fitness of [Mr.] Poythress . . . to retain his certification as a law enforcement officer." Doc. 34-8 at 1. The hearing was consolidated with a character review hearing for Mr. Washington. *Id.*

Chief Cotton testified at the hearing that he "terminated [Mr.] Poythress for violations of the use of force policy," and that "each tasing of [Mr.] Isbell by [Mr.] Poythress was unjustified and constituted excessive force." *Id.* at 3. The APOST

11

Commission found "based upon its independent review of the jail surveillance video, that [Mr.] Poythress used unnecessary and excessive force on [Mr.] Isbell by tasing him a dozen or more times and placing him in a restraint chair which neither [Mr.] Poythress nor [Mr.] Washington knew how to utilize." *Id.* at 7. The Commission further found that "the video and, the testimony presented by [Mr.] Poythress, does not reflect any physical or overt action by the inmate [Mr.] Isbell that would reasonably require the use of physical force to subdue or control the inmate." *Id.* The Commission revoked Mr. Poythress's certification as a law enforcement officer. *Id.* at 8. The Commission also revoked Mr. Washington's certification as a law enforcement officer based on the jail incident. Doc. 34-9 at 20, Depo. 77:1–7.

### E. Deposition and Affidavit Testimony about Lieutenant Shaw

#### 1. Mr. Poythress's Testimony

Mr. Poythress's testified about "examples of how Lieutenant Shaw treated people differently of different colors." Doc. 34-1 at 37, Depo. 146:1–3. First, Mr. Poythress testified that Lieutenant Shaw gave Officer Huckabee, a white male who was employed after Mr. Poythress, a taser before he gave one to Mr. Poythress. *Id.*, Depo. 146:4–22.

Mr. Poythress also testified that Lieutenant Shaw "didn't do anything" about incidents involving Officer Turnbloom, a white male: first, "nothing happened" even though Officer Turnbloom "got into an altercation" with Lieutenant Shaw after an

accident involving a pedestrian; second, Lieutenant Shaw "didn't do anything" about allegations that Officer Turnbloom "violat[ed] civil rights of people of color by making up traffic stops." *Id*., Depo. 147:7–148:4.

Mr. Poythress further testified that Chad Garganus, a white male officer, "used his City phone for personal reasons, personal gain, using Only Fans, using a vehicle, a City vehicle for personal reasons and he was witnessed stealing time, but nothing was done" by Lieutenant Shaw. *Id*. at 38, Depo. 149:18–150:2.

Finally, Mr. Poythress testified that when a white female jailer punched a black female inmate in the face, "Lieutenant Shaw and Chad Garganus rolled the camera back in the dispatch office and pretty much laugh[ed] about it, dubb[ing] her as Rocky." *Id*. at 42, Depo. 166:5–18.

### 2. Mr. Washington's Testimony

First, Mr. Washington testified that Lieutenant Shaw once told him that he "was under investigation and charges could be brought against [him]," without telling him what the charges were and who had made the complaint. Doc. 34-9 at 20, Depo. 78:14–22. Mr. Washington testified that Lieutenant Shaw "basically . . . did a write up on [him] and didn't have the proper information or anything to lead [him] to believe that [he] could have charges brought against [him] for nothing." *Id*., Depo. 79:22–80:2. But Mr. Washington was not suspended and did not lose any pay because of that investigation. *Id*. at 22, Depo. 87:4–7.

13

Second, Mr. Washington testified about an incident where Lieutenant Shaw "started cussing at [him]," and told him "I'm the lieutenant and I can do what I want to." *Id.* at 20, Depo. 80:13–17. Mr. Washington considered Lieutenant Shaw's comments to be racially discriminatory because he said "[he] could write [his] black ass up, too." *Id.* at 23, Depo. 89:15–17.

Third, Mr. Washington testified that he observed different responses to vehicle accidents, which he believed to be on the basis of race: "[Y]ou had an officer wreck a car, nothing was done to him. . . . He got it fixed. You had a black officer back into one of the little safety poles, they made him drug test and do everything." *Id.* at 21, Depo. 81:3–10. Mr. Washington named Officer Benson as the "black officer who backed into a pole," *id.* at 23, Depo. 90:12–14, and Officers Barnes and Garganus as officers to whom nothing was done for their vehicle accidents. *See id.*, Depo. 91:16–92:7. Mr. Washington's testimony leaves unclear, however, Lieutenant Shaw's role in these incidents.

Fourth, Mr. Washington testified that "a white female jailer punch[ed] a black female inmate and nothing was done." *Id.* at 21, Depo. 81:20–22. According to Mr. Washington, "They looked at the video over and over, Lieutenant Shaw and Chad Garganus, laughing, making jokes in the office and everything." *Id.*, Depo. 81:22–82:2.

14

### 3.  Tuesday Wells-Shaw's Affidavit Testimony

Tuesday Wells-Shaw filed an affidavit testimony, which was attached as an exhibit to Mr. Washington's complaint. *Washington* Doc. 21-1. Ms. Shaw testified that she heard Lieutenant Shaw use racial slurs and use those slurs specifically in reference to Mr. Poythress. *See id.* at 2–3. She did not testify that she heard Lieutenant Shaw use those racial slurs directly to Mr. Poythress. *See id.*

### F.  Procedural History

Mr. Poythress asserts the following claims against the City: discrimination based on race (Count One) and sex (Count Three); retaliation based on the grievance he filed on September 27, 2020 (Count Four); and "hostile work environment because of his race and sex" (Count Five), Doc. 1 ¶ 79. Mr. Poythress asserts those claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Mr. Poythress asserts claims against the City and Lieutenant Shaw in two counts:[4] discrimination based on race in violation of 42 U.S.C. § 1981 (Count Two), and discrimination based on race and sex in violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment (Count Six). *See* Doc. 1. Each count is based on Mr. Poythress's allegation that the defendant(s) named in the count "conduct[ed] a meritless investigation and wrongfully terminat[ed]" him. Doc. 1 ¶¶ 48, 64, 71, 94, 114; *see also id.* ¶ 77 (alleging that those actions were retaliatory).

---

[4] On July 27, 2022, the court dismissed all claims against Mayor Pam Palmers. Doc. 18.

Mr. Washington's amended and operative complaint contains two counts, both asserted against the City and Lieutenant Shaw: (1) discrimination based on race in violation of Section 1981 under Section 1983 (Count One), and (2) discrimination based on race in violation of Section 1983 and the Equal Protection Clause of the Fourteenth Amendment (Count Two). *See Washington* Doc. 21. Each count is based on Mr. Washington's allegation that the defendants "conduct[ed] a meritless investigation and wrongfully terminat[ed]" him. *Id.* ¶¶ 53, 76.

The City and Lieutenant Shaw moved for summary judgment on all plaintiffs' claims. Doc. 31. The motion is fully briefed. Docs. 32, 37, 38. The plaintiffs filed a consolidated response brief in opposition to summary judgment. Doc. 37. The plaintiffs did not file any evidence to support their opposition; their brief refers only to the affidavit filed with Mr. Washington's amended complaint and the defendants' evidentiary submission in support of their motion for summary judgment.

## II. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could "affect the outcome" of the case. *Furcron v. Mail Ctrs. Plus*, *LLC*, 843 F.3d 1295, 1303 (11th Cir. 2016) (cleaned up). A material fact is in "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (cleaned up).

In deciding a motion for summary judgment, the court "must view the evidence in the light most favorable to the non-movant." *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). The court does not "weigh conflicting evidence or make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Wate v. Kubler*, 839 F.3d 1012, 1018 (11th Cir. 2016). But when material facts are captured by video-camera footage, the court "view[s] the facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Binding precedent from the Supreme Court dictates that this court "not . . . rel[y]" on the parties' testimony when it conflicts with events that are "depicted by the videotape." *Id.*

"[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Anthony*, 69 F.4th at 804 (cleaned up). "A mere scintilla of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Gogel v. Kia Motors Mfg. of Ga., Inc.,* 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (cleaned up). "Summary judgment must be granted if the nonmoving party has 'failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.'" *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1294 (11th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

## III.   ANALYSIS

### A. Mr. Poythress and Mr. Washington's Title VII, Section 1981, and Section 1983 Discrimination Claims Against the City

Discrimination claims are "typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016). The two are "different theories of discrimination" that "serve as alternative causation standards for proving discrimination." *Id*. n.4 ("Nonetheless, for the sake of brevity . . . we refer to them as mixed-motive and single-motive 'claims.'"). "[S]ingle-motive claims—which are also known as 'pretext' claims—require a showing that bias was the true reason for the adverse action." *Id*. at 1235. This causation standard is also known as the "but-for" standard. *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1319 (11th Cir. 2023). Mixed-motive claims, on the other hand, require only a showing "that illegal bias . . . was a motivating factor for an adverse employment action, even though other factors also motivated the action." *Id*. at 1327 (cleaned up).

"Th[e] motivating-factor causation standard . . . is distinct from, and more forgiving than, a but-for standard, as liability can sometimes follow even if a protected trait wasn't a but-for cause of the employer's challenged decision." *Akridge v. Alfa Ins. Cos*., 93 F.4th 1181, 1192 (11th Cir. 2024) (cleaned up). "[B]ut-for causation requires an employee to show that a cause was outcome determinative,

meaning that a particular outcome would not have happened but for the purported cause." *Id.* at 1192–93 (cleaned up).

Mr. Poythress and Mr. Washington have not asserted mixed-motive discrimination claims. Each complaint alleges only that "[t]he Defendant has intentionally discriminated against Plaintiff based on his [protected characteristic] by conducting a meritless investigation and wrongfully terminating Plaintiff." Doc. 1 ¶ 64; *see also id.* ¶¶ 48, 71, 77, 94, 114; *Washington* Doc. 21 ¶¶ 53, 76. The complaints do not allege that race or sex was a "motivating factor" for the allegedly adverse employment actions they suffered. *See* Doc. 1; *Washington* Doc. 21. Moreover, Mr. Poythress and Mr. Washington make no argument about mixed-motive claims in their response in opposition to summary judgment. *See* Doc. 37.

"To prevail on a particular theory of liability, a party must present that argument to the district court." *Fils v. City of Aventura*, 647 F.3d 1272, 1284 (11th Cir. 2011). "[D]istrict courts cannot concoct or resurrect arguments neither made nor advanced by the parties." *Id.*; *see also Williams v. Hous. Auth. of Savannah, Inc.*, 834 F. App'x 482, 489 (11th Cir. 2020) ("Because [the plaintiff] [bears] the burden of formulating the arguments [he] wishe[s] for the court to address, the court [is] not required to evaluate the evidence under a theory of discrimination that [the plaintiff] did not raise."). Accordingly, the court considers only single-motive discrimination claims against the Defendants.

The same legal framework applies to evaluating single-motive discrimination claims against an employer under Title VII, Section 1983, and Section 1981.[5] *See Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (holding where the plaintiff alleged "sex and race discrimination under Title VII, the Equal Protection Clause, and 42 U.S.C. § 1981" that "[t]he legal elements under any of these frameworks are identical"); *Stallworth v. Shuler*, 777 F.2d 1431, 1433 (11th Cir. 1985) ("Where, as here, a plaintiff predicates liability under Title VII on disparate treatment and also claims liability under sections 1981 and 1983, the legal elements of the claims are identical."). The court thus addresses together all discrimination claims against the City.

Title VII prohibits employers from discriminating in the workplace based on an "individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). But "not all conduct by an employer negatively affecting an employee constitutes adverse employment action." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001), *overruled on other grounds by Burlington N. & Santa*

---

[5] To establish municipal liability under Section 1983, a plaintiff must: "(1) identify[] an official policy; (2) identify[] an unofficial custom or widespread practice that is so permanent and well settled as to constitute a custom and usage with the force of law; or (3) identify[] a municipal official with final policymaking authority whose decision violated the plaintiff's constitutional rights." *Chabad Chayil, Inc. v. Sch. Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022). Nevertheless, where "a plaintiff attempts to use Title VII and 42 U.S.C. § 1983 as parallel remedies for the same allegedly unlawful employment discrimination, the elements of the two causes of action are identical, and identical methods of proof . . . are used for both causes of action." *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020) (cleaned up). Where the Title VII claim does not survive summary judgment, the Section 1983 claim does not either, without the need to separately analyze municipal liability. *See id*. 1325–29.

*Fe Ry. Co. v. White*, 548 U.S. 53 (2006)); *see id.* ("This limitation is consistent with the basic principle that Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace.") (cleaned up). "A plaintiff who fails to prove that . . . [he] suffered an adverse employment action, will be unable to prove that [he] was unlawfully discriminated against." *Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946 (11th Cir. 2023).

"An employee must establish an adverse employment action by proving that a decision of the employer impacted the terms, conditions, or privileges of her job in a real and demonstrable way." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920–21 (11th Cir. 2018) (cleaned up). "The employee must show a *serious and material* change in the terms, conditions, or privileges of employment so that a reasonable person in the circumstances would find the employment action to be materially adverse." *Id.* at 921 (cleaned up).

The only adverse employment action that Mr. Poythress and Mr. Washington have established is their termination. Under controlling precedent, because Mr. Poythress and Mr. Washington were placed on administrative leave with pay pending the investigation into the jail incident, the investigation by itself did not entail "a *serious and material* change in the terms, conditions, or privileges" of their employment. In *Davis v. Legal Services Alabama, Inc.*, 19 F.4th 1261, 1264 (11th Cir. 2021), the plaintiff was "suspend[ed] . . . with pay pending an investigation of

21

the complaints against him." The court held that "a simple paid suspension is not an adverse employment action," and that "[a] paid suspension can be a useful tool for an employer to hit 'pause' and investigate when an employee has been accused of wrongdoing." *Id.* at 1267. The court rejected the plaintiff's argument that the circumstances of his suspension made it rise to the level of an adverse employment action—specifically, that he served as the "public face" of the organization and that his "paid suspension was more adverse to him than it would be to a low-level employee." *Id.*

The court finds no basis to hold that the investigation in this case entailed more than a simple paid suspension. Allegations that the investigation was meritless and motivated by illegal biases do not change the fact that Mr. Poythress and Mr. Washington were placed on administrative leave with pay pending the investigation. Accordingly, the court addresses only whether the City discriminated against Mr. Poythress and Mr. Washington by terminating them.

"[A]n employer can generally fire or discipline an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, so long as that action is not for a discriminatory reason." *Tynes*, 88 F.4th at 944 (cleaned up). The court does not "sit as a super-personnel department that reexamines an entity's business decisions," *Gogel*, 967 F.3d at 1143 (cleaned up), and does not "adjudge[e] whether employment decisions are prudent or fair." *Damon v. Fleming*

*Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999). "[T]he ultimate question in a[n] [employment] discrimination case is whether there is enough evidence to show that the reason for an adverse employment action was illegal discrimination." *Tynes*, 88 F.4th at 941.

A plaintiff relying on circumstantial evidence can survive summary judgment by satisfying the burden-shifting framework found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or by presenting "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (cleaned up).

Under the *McDonnell Douglas* framework, a plaintiff must first establish a *prima facie* case of discrimination by showing that "(1) [he] belongs to a protected class, (2) [he] was subjected to an adverse employment action, (3) [he] was qualified to perform the job in question, and (4) [his] employer treated similarly situated employees outside [his] class more favorably." *Tynes*, 88 F.4th at 944 (cleaned up). "The last requirement is met when the plaintiff presents evidence of a comparator—someone who is similarly situated in all material respects." *Id.* (cleaned up). "The prima facie showing entitles the plaintiff to a rebuttable presumption of intentional discrimination." *Id.* "The defendant then rebuts that presumption (if it can) by offering evidence of a valid, non-discriminatory justification for the adverse employment action." *Id.* "Once that justification is offered, the presumption of

discrimination falls away and the plaintiff tries to show not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination." *Id*. "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Chapman v. AI Transport*, 229 F.3d 1012, 1024–25 (11th Cir. 2000) (en banc).

Where a plaintiff fails to establish a *prima facie* case under *McDonnell Douglas*, he may nonetheless "establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) systematically better treatment of similarly situated employees, and (3) pretext." *Jenkins*, 26 F.4th at 1250.

In any event, a plaintiff alleging single-motive discrimination must establish pretext, either under the *McDonnell Douglas* framework or because "single-motive claims . . . are also known as 'pretext' claims." *Quigg*, 814 F.3d at 1235.

"To establish pretext, an employee must cast sufficient doubt on the employer's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that they were not what actually motivated its conduct." *Phillips*, 87 F.4th at 1323–24 (cleaned up). "The employee achieves this by demonstrating such

weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Id*. at 1324 (cleaned up). "Mere conclusory allegations and assertions [do] not suffice" to establish pretext. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009) (cleaned up).

"[A]n employer's honest belief that the employee violated its policies can constitute a legitimate reason for termination, even if such a belief may have been mistaken or wrong." *Carlisle v. Rhodes & Rhodes Fam. Dentistry*, No. 22-13901, 2024 WL 621421, at * 5 (11th Cir. Feb. 14, 2024) (holding that the plaintiff failed to establish pretext because although the plaintiff "dispute[d] being combative or insubordinate, her assertions [did] not refute that [employer] held an honest belief that she engaged in insubordinate and hostile behavior"); *see also Damon*, 196 F.3d at 1363 n.3 ("An employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."); *Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981."). "For an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant

in good faith believed plaintiff's performance to be unsatisfactory." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (cleaned up).

The City argues that it terminated Mr. Poythress and Mr. Washington because of "their violations of the use of force protocol which is captured on video." Doc. 32 at 20. The court construes "violations of the use of force protocol which is captured on video" to refer to all policy violations related to Mr. Poythress's use of a taser on Mr. Isbell and Mr. Washington's supervision of that use. According to the Disciplinary Action Forms that served as notices of termination, Mr. Poythress and Mr. Washington violated the Electronic Control Devices policy as well as the Use of Force policy during the jail incident. *See* Doc. 34-7; Doc. 34-14. Because the Electronic Control Devices policy concerns the use of tasers, the court considers violations of the Electronic Control Devices policy as part of the City's proffered reasons for terminating Mr. Poythress and Mr. Washington.

Mr. Poythress and Mr. Washington do not dispute that violations of City policies regarding the use of tasers, if true, constitute legitimate and nondiscriminatory reasons for their termination. *See* Doc. 37. But they make no argument that the City's proffered reasons were pretextual and that the real reason was unlawful discrimination. *See id.* Mr. Poythress and Mr. Washington argue only that they have established "a convincing mosaic of circumstantial evidence . . . [of] intentional discrimination by the decisionmaker" because Mr. Poythress "was

subjected to several derogatory comments by [Lieutenant] Shaw" and Mr. Washington "testified regarding the racist culture that permeated the City of Adamsville Police Department." *Id.* at 6 (cleaned up). Mr. Poythress and Mr. Washington also assert that they have "submitted an affidavit that shows [Lieutenant] Shaw's animus towards African Americans," which allegedly "demonstrates his potential motive in bringing the baseless investigation regarding the [jail] incident." *Id.*

As the court already held, Mr. Poythress and Mr. Washington have not asserted mixed-motive claims, which impose liability where a protected characteristic was a "motivating factor" in the adverse employment action. Indeed, Section 1981 does not allow mixed-motive claims. *Phillips*, 87 F.4th at 1321. The relevant causation standard for Mr. Poythress and Mr. Washington's discrimination claims is but-for causation, and the record does not allow the jury to infer that unlawful discrimination was the but-for cause of their termination. At most, there is evidence that Lieutenant Shaw held biases; there is not evidence that Mr. Poythress and Mr. Washington would not have been terminated but for those biases.

Without making any argument about pretext, Mr. Poythress and Mr. Washington dispute certain facts related to the City's proffered reasons for terminating them. First, the plaintiffs dispute that Mr. Poythress "was seeking to discipline [Mr.] Isbell for being noisy," asserting that "[a]t no point did [Mr.]

Poythress testify that he was irritated at [Mr.] Isbell or that he wanted to punish [Mr.] Isbell for being noisy." *Id*. at 1 (cleaned up). The plaintiffs assert that Mr. Poythress "consistently testified that [Mr.] Isbell was being defiant, masturbating, and non-compliant with jail staff during his encounters with [Mr.] Isbell and that use of the restraint chair was required to gain compliance of an inmate at the jail." *Id*.

The plaintiffs also dispute that Mr. Poythress "used his taser on [Mr.] Isbell more than twice," citing Mr. Washington's testimony that Mr. Poythress "only stunned [Mr.] Isbell twice." *Id*. at 2. The plaintiffs dispute that Mr. Washington "was required to instruct [Mr.] Poythress to put his taser away," and cite Mr. Washington's testimony "that stunning [Mr.] Isbell as [Mr.] Poythress did was necessary as [Mr.] Isbell had kicked his legs out of the restraint and was being noncompliant." *Id*.

Although the surveillance video establishes that Mr. Poythress pulled out his taser and placed it on or near Mr. Isbell's body multiple times, it leaves unclear how many times Mr. Poythress activated it. The court therefore credits Mr. Poythress's testimony that he did not activate his taser more than once. But Mr. Poythress's testimony does not establish that the City lacked a good faith belief that Mr. Poythress activated his taser more than once. In the video, Mr. Poythress places his taser on or near Mr. Isbell's body multiple times, and Mr. Isbell makes subsequent movements that could be read as a reaction to being tased more than once. That the

City may have been mistaken in its belief that Mr. Poythress tased Mr. Isbell multiple times does not establish pretext. *See Carlisle*, 2024 WL 621421, at * 5.

Moreover, the Disciplinary Action Forms also cite other policy violations unrelated to the number of times Mr. Poythress used his taser. Those violations include "deploy[ing] a Taser on a passively resistant inmate who was restrained," or "us[ing] the device on a handcuffed person who was not actively resistant." Doc. 34-7 at 2. The surveillance video does not contradict a good faith belief that Mr. Isbell was a "passively resistant inmate who was restrained" or a "handcuffed person who was not actively resistant" when Mr. Poythress activated his taser on Mr. Isbell's thigh near timestamp 3:19:48.

Mr. Isbell's wrists and shoulders were strapped to the chair, so that he could not move his arms or his upper body. And although Mr. Isbell's legs were not restrained, he was not kicking or attempting to kick his legs before Mr. Poythress pulled out his taser. The video from 3:19:00 to 3:19:48 shows that after Mr. Isbell had slipped his right foot out of the loose loop and crossed his right ankle behind the left, his legs were not moving. At no point was Mr. Isbell kicking or attempting to kick Mr. Poythress in the lead up to Mr. Poythress's activation of his taser.

Based on the surveillance video, Mr. Poythress and Mr. Washington cannot establish "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" such that a reasonable jury could discredit the City's proffered

reasons for their termination. *Phillips*, 87 F.4th at 1323–24 (cleaned up). Without evidence of pretext, Mr. Poythress and Mr. Washington have not developed sufficient evidence for a reasonable jury to find that discrimination based on race or sex was the true reason for their termination. Accordingly, summary judgment is **GRANTED** in favor of the City on all of Mr. Poythress and Mr. Washington's discrimination claims under Title VII, Section 1981, and Section 1983.

### B. Mr. Poythress and Mr. Washington's Section 1981 and Section 1983 Discrimination Claims Against Lieutenant Shaw

As with the discrimination claims against the City, Mr. Poythress and Mr. Washington's discrimination claims against Lieutenant Shaw are based on the allegation that he "conduct[ed] a meritless investigation and wrongfully terminat[ed] Plaintiff." Doc. 1 ¶¶ 64, 114; *see also Washington* Doc. 21 ¶¶ 53, 76.

The court already held that the investigation of the jail incident does not constitute an adverse employment action and that there is insufficient evidence for a reasonable jury to find that Mr. Poythress and Mr. Washington would not have been terminated but for unlawful discrimination.[6] Accordingly, summary judgment is

---

[6] The court therefore need not decide whether Lieutenant Shaw was a decisionmaker who could be held liable under Section 1983. *Gilroy v. Baldwin*, 843 F. App'x 194, 196 (11th Cir. 2021) ("[A] defendant is a decisionmaker subject to individual liability [under Section 1983] when he has the authority 'not merely to recommend' the plaintiff's termination, 'but to immediately effectuate' it.") (quoting *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003)). The court also need not decide whether Lieutenant Shaw may be held personally liable under Section 1981. *See Okwan v. Emory Healthcare Inc.*, No. 20-11467, 2021 WL 4099236, at *1 n.1 (11th Cir. Sept. 9, 2021) (explaining that although the Eleventh Circuit "ha[s] never expressly addressed the question of

**GRANTED** in favor of Lieutenant Shaw on all discrimination claims against him under Section 1981 and Section 1983.

### C. Mr. Poythress's Title VII Hostile Work Environment Claim Against the City

"To establish a claim of hostile work environment, an employee must prove that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1248 (11th Cir. 2014) (cleaned up). Specifically, the employee must prove:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome . . . harassment; (3) that the harassment was based on his [protected characteristic]; (4) that the harassment was severe or pervasive enough to alter the terms and conditions of his employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for the environment under a theory of either vicarious or direct liability.

*Id*. at 1248–49.

"Either severity or pervasiveness is sufficient to establish a violation of Title VII." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (cleaned up). But "the employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and

---

whether an individual can be held personally liable under § 1981," it has "suggested that such liability may exist").

this subjective perception must be objectively reasonable." *Id*. at 809 (cleaned up). The court considers four factors when evaluating "whether a work environment is objectively hostile": "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Adams*, 754 F.3d at 1250–51 (cleaned up).

The City argues that "there is no evidence that [Mr.] Poythress experienced anything which could amount to a hostile work environment." Doc. 32 at 40. According to the City, "incidents which [Mr.] Poythress alleges amount to a hostile work environment actually only amount to 'occasional teasing.'" *Id*.

Mr. Poythress responds that he has produced sufficient evidence of a hostile work environment, citing his testimony that Lieutenant Shaw told him he "walked like a faggot" and "must be one." Doc. 37 at 11. Mr. Poythress further asserts that this comment prompted him to first "make a verbal grievance" and then "file[] a "formal grievance" against Lieutenant Shaw. *Id*. at 11–12. Mr. Poythress suggests that the fact that Lieutenant "Shaw was then the investigator [of the jail incident] that ultimately led to [his] termination" also supports a hostile work environment claim. *Id*. at 12.

Although Mr. Poythress's complaint alleges that that he was "subjected to a hostile work environment because of his race and sex," Doc. 1 ¶ 79, Mr. Poythress

makes no argument that he was subjected to racial harassment. *See* Doc. 37 at 11–12. "[G]rounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned." *Resol. Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."). In any event, Mr. Poythress's testimony about Lieutenant Shaw's preferential treatment of white officers or laughing at a white female jailer punching a black female inmate, *see supra* Section I.E.1, does not allow a reasonable jury to find that his workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Adams*, 754 F.3d at 1248 (cleaned up). The court therefore addresses only the arguments that Mr. Poythress makes about sexual harassment.

Mr. Poythress testified that the Lieutenant Shaw's comment in May 2020 that he "walked like a faggot" and "must be one" was the only time he made sexually derogatory comments. Doc. 34-1 at 41, Depo. 163:6–16. The record contains no evidence that Mr. Poythress experienced other forms of harassment based on his sex. To the extent that Mr. Poythress suggests Lieutenant Shaw's investigation of the jail incident was also harassing conduct, he has not developed evidence that the

investigation about City policy violations was "based on" his sex. *Adams*, 754 F.3d at 1249.

Even if Mr. Poythress perceived Lieutenant Shaw's comments in May 2020 to alter the terms and conditions of his employment, a reasonable jury could not find that this subjective perception was objectively reasonable. Lieutenant Shaw's comments were an "offensive utterance" made on a single occasion, and there is no evidence that the comments "unreasonably interfere[d] with [Mr. Poythress's] job performance." *Id.* at 1250–51 (cleaned up). The fact that Mr. Poythress complained about Lieutenant Shaw's comments, including the filing of a formal grievance, does not establish that his subjective perception was objectively reasonable.

Accordingly, summary judgment is **GRANTED** in favor of the City on Mr. Poythress's hostile work environment claim.

### D. Mr. Poythress's Title VII Retaliation Claim Against the City

"To make a *prima facie* case for a claim of retaliation under Title VII, a plaintiff must first show (1) that [he] engaged in statutorily protected activity, (2) that he suffered an adverse action, and (3) that the adverse action was causally related to the protected activity." *Gogel*, 967 F.3d at 1134 (cleaned up). "Once the *prima facie* case is established . . . [t]he burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action." *Id.* at 1135. "If the employer produces such a reason . . .

34

the plaintiff must then demonstrate that the proffered reason was merely a pretext to mask retaliatory actions." *Id*. (cleaned up). "To establish the necessary causation, a plaintiff must demonstrate that [his] protected activity was a but-for cause of the alleged adverse action by the employer." *Id*. (cleaned up). "In other words, a plaintiff must prove that had [he] not engaged in the protected conduct, [he] would not have been fired." *Id*. (cleaned up). "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Id*. (cleaned up).

Mr. Poythress asserts that he "engaged in a statutorily protected activity by the filing of his grievance against [Lieutenant] Shaw to Chief Cotton." Doc. 37 at 9. Mr. Poythress further asserts that he "has shown . . . that his protected activity and the adverse employment action are not wholly unrelated" because "[n]ot one month later, [he] was fired based on an incident that [Lieutenant] Shaw himself investigated." *Id*.

The court assumes without deciding that the formal grievance that Mr. Poythress filed on September 27, 2020, about Lieutenant Shaw's sexually derogatory comments in May 2020 constitutes statutorily protected activity. And Mr. Poythress's termination is still the only adverse employment action at issue. And because Mr. Poythress received notice of the investigation on September 25, 2020, filing a formal grievance two days later could not have caused the investigation.

"While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient." *Gogel*, 967 F.3d at 1137 n.15. Thus, the temporal proximity between the formal grievance that Mr. Poythress filed (September 27, 2020) and his termination (October 16, 2020) cannot establish pretext by itself. And the court already held that there is insufficient evidence for a reasonable jury to find that the nondiscriminatory and legitimate reasons the City proffered for terminating Mr. Poythress were pretextual. *See supra* Section III.A. Accordingly, a reasonable jury could not find that the formal grievance that Mr. Poythress filed was the but-for cause of his termination, and summary judgment is **GRANTED** in favor of the City on Mr. Poythress's Title VII retaliation claim.

## IV.   CONCLUSION

For the reasons explained above, summary judgment is **GRANTED** in favor of the City and Lieutenant Shaw on all Mr. Poythress and Mr. Washington's claims. The Clerk of Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this 21st day of March, 2024.



ANNA M. MANASCO
UNITED STATES DISTRICT JUDGE

36